Thank you, Judge Smith. Good morning, Your Honors, and May it please the Court. My name is Wei Liu, here on behalf of Petitioner Carlena Dawson. I'm a certified law student of UC Irvine Appellate Litigation Clinic, appearing under the supervision of Katherine Davis. I'd like to reserve three minutes for rebuttal. Okay, I think the way we got this set up today is that you're going to do the main argument, you have 12 minutes, and then Ms. Lam is doing the rebuttal with three minutes. Did I misunderstand? No, that's correct. Okay, so you don't need to reserve anything. Ms. Lam already has three minutes. Awesome, great, thank you. Please proceed. Thank you. This Court should reverse and remand the BIA's decision because the agencies failed to follow the Ninth Circuit law by failing to consider evidence of past torture in the aggregate and by failing to consider all the evidence, including country conditions evidence. On the HADA Aguilar v. Lynch, the agencies must consider claims in the aggregate, and the BIA and IJ failed to do so by exclusively relying on a curated two-year period to find no likelihood of future torture. When being considered in the aggregate, the record clearly shows that Ms. Dawson constantly suffered past torture for years which makes her more likely to be tortured again if returned to Jamaica. Even the government considered in its answering brief that Ms. Dawson suffered past torture on page 14 of their answering brief. And under EDU v. Holder, past torture is the principal factor courts consider when reviewing claims. Specifically, Ms. Dawson suffered physical torture, including sexual abuse, while she was in Jamaica. She was repeatedly raped and severely beaten, which resulted in injuries, blood transfusions, scars, and hospitalization. So the court looked at what happened after the protective order was issued and said after that point she didn't experience torture. There might have been some harassment. What was wrong about that? Your Honor, the record shows that the IJ and BIA did not apply the correct legal analysis on that issue. The IJ assumed aggregando that Ms. Dawson suffered past torture, but then he did not proceed on that presumption. Instead, he incorrectly focused on the two years after protective order as a separate divisible period. So the IJ violated his obligation under Quijada Aguilar to consider all evidence in the aggregate. Under Neuro v. Gonzalez, once past torture... So the IJ's task was determining whether the petitioner showed it was more likely than not that she would be tortured upon return by the government or officials who were acquiescing and said, well, after the court ordered, there was no more torture, and therefore she hasn't carried her burden. So whether or not he looked at the period in the aggregate or not, why are we compelled to find otherwise? Your Honors, under Neuro v. Gonzalez, once past torture is established, a presumption of likelihood of future torture arises, and the protective order does not rebut such presumption because the risk of future torture is not eliminated. Even after the 2016 protective order, Hines repeatedly violated order by breaking into the house at least twice and physically attacked Ms. Dawson. She shot out light with a gun, and he also almost ran her over with his car. The police continued to threaten her with death, entered the house on behalf of Hines, showing their guns, and completely ignored the protective order and told her to leave the house. Ms. Dawson tried— I'm largely with you on the torture and so on, but you just stated, if I understood you correctly, that once past torture is established, there's a presumption of future torture. That's not really true. I know it is under asylum and a few others, but is that true under CAT claims? Yes, Your Honor. So the language in Neuro v. Gonzalez states that once an individual has been tortured and escaped to another country, it is likely that she will be tortured again if returned to the site of her prior suffering unless circumstances or conditions have changed significantly. That is on page 1217-18 of Neuro v. Gonzalez. Therefore, it is our reading of Neuro that once the presumption of likelihood of future torture is established, it is not rebutted unless there is significantly changed circumstance. I wrote a case last year called Ouitchouab Haimes v. Barr. What role, if any, do you believe that case plays in this case? Yes, Your Honor. There are a few roles that that case played in our case. First, Ms. Dawson actually suffered a lot of similar torture as the petitioner, Angel Chihua Haimes. For example, she was also constantly raped and beaten by Heinz, and she was threatened with death, decapitation from both Heinz and the police. And second, like the petitioner Angel Chihua Haimes, whose condition remained the same because she continued to receive death threats and was subject to repeated intimidation tactics from the same group of abusers, Ms. Dawson continued to receive death threats and intimidation from both Heinz and the police even after the protective order was issued. Therefore, it shows that her condition did not significantly change. Based on my reading of the record, it seems like the things that she continued to suffer after the protective order, from the leaving of the bullet on the doorstep to the stalking to other intimidation, given the past history, each constitute a form of torture recognized by our court. Do you agree with that? Yes. So are you referring to the post-protective conduct? Right. Okay, yes. So we believe that Haimes' post-protective order conduct constitute torture. In Rodriguez de Ayala v. Barr, the court ruled that verbal and emotional abuse in a case of domestic violence constitutes torture. Here, Haimes inflicted mental harm for the purpose of intimidating and coercing Ms. Dawson to leave the house and punishing her for obtaining the protective order. As mentioned, he also physically tried to torture, continuing his torture of Ms. Dawson. And when we view his post-protective conduct in the aggregate, it is clear that his conduct was just a mere continuation of his previous torture of Ms. Dawson. Ms. Dawson is likely to be subject to torture again. This is also busted by country conditions report showing that she's at a particularly high risk of suffering lifetime physical and sexual violence because she has experienced at least two controlling behaviors in Haimes' hands, the country reports indicated. First, more than 50% of Jamaican women whose partners frequently accused them of being unfaithful suffer lifetime physical or sexual violence. Here, Haimes accused Ms. Dawson of being unfaithful multiple times. And second, more than 50% of women whose partners expect them to ask his permission before seeking health care for themselves suffer lifetime physical and sexual violence. And in our case, Haimes did not even allow Ms. Dawson to go to the hospital until she was suffering really that pain, could no longer keep foot down, and was throwing up blood. When we consider the likelihood of future torture, we're supposed to consider what happened in the past, right? Yes. As I understand it, in June of 2016, when she reported the abuse to the police, the police station, and I'm quoting here from the record, sent two officers that knew Robert to the house, and the officers gave Dawson a warning that if she didn't leave, she would lay beside the road dead. That's a pretty strong indication that this guy's not going away, right? Yes. Yes, Your Honor. In addition to that, after Haimes violated the protective order, he was taken to the police station for only an hour, and then was released. Therefore, he remains free, at large, and willing and able to resume his torture of Ms. Dawson. In addition, in Xochitl Haimes, the court finds past torture when the petitioner suffered rape and beating when she was a teenager, which happened more than 10 years ago. Therefore, the mere passage of time does not defeat the fact, the presumption, that Ms. Dawson has suffered past torture. Your Honor. You don't have to use all your time if you don't want to. It's entirely up to you. Sure. Just one last quick point. So, in addition to the fact— So, the last point is that Ms. Dawson is also unable to relocate, as the record shows that she tried to move to a Spanish town, but Hines was able to track her down, threaten her and her friends. And in Xochitl Haimes, the court stated that the absence of affirmative evidence showing a general or specific area of relocation weighs in favor of granting cat reliefs. And here, the country conditions report shows that Jamaica is really small, and the fact that Hines was able to find her, track her, and the fact that he is well-connected in Jamaica, weighs in favor of the fact that Ms. Dawson will not be able to safely relocate in Jamaica. Any of my colleagues have additional questions? Very well. So, we'll hear from Mr. Salter from the government, please. Good morning, Your Honors. Good morning, Your Honors and Counsel. May it please the Court, my name is Rob Stalzer, and I'm here on behalf of the AG. Your Honors, the question here is what the evidence compels, whether the likelihood of torture is actually compelled based on this evidence, which includes both the evidence of past torture, that my sister counsel has talked about extensively, but also the change in circumstances that occurred for Mrs. Dawson in her last few years in Jamaica. During that period, she was not tortured the way that she was before. She had freed herself of the domestic situation with her abuser, Mr. Hines, and eventually had obtained a temporary protective order, and then a five-year full protective order to prevent him from resuming his torture of her, from resuming the four conditions. Counsel, I've got to tell you, I've been on this Court for 15 years, and I have rarely read a record showing more despicable conduct by a man against a woman than in this case. If I understand correctly, after the protective order was issued, this man continued to stalk her. He left a bullet on the front door. He called and threatened her. She was, as far as she's concerned, she said this to the IJ, that if she goes back, she's dead. Now, we have lots of cases that say each of those individual elements, in and of themselves, constitute torture. But when you consider the past conduct here, particularly in a country like Haiti, the idea that a protective order is going to protect her against this guy is, in my mind, ludicrous. What do I do with my concern? Your Honor, she was able to avail herself of that protective order in the past on some occasions. On some occasions, as you pointed out, the police were friends of the abuser. But on other occasions, she was able to actually call the police for help. And then there was the one occasion when his mother came and tried to evict her, and a police officer came by and said, no, no, you can't do that. Let's just say hypothetically that she can get the court order any time. I think there's a five-year one or something like that. As you know, even in the United States, when there are terribly abusive relationships, court orders are rarely effective in stopping people. And what this record seems to show to me is this is a guy who absolutely has shown that he wants to dominate and brutalize this poor woman. And he continues to do so. Now, he's careful. He wants to be careful how he does it. But he knows the police. He's got friends with the police. And she was told that she's probably going to end up by the side of the road dead. If you had a daughter like this, would you say she was protected by a protective order against this guy? The question, Your Honor, is whether or not that would constitute torture. You don't think it does? I don't. I think the board—well, the board found that it didn't. And I agree for the reason that she was there. She was able to remain there for at least a period of time after she had freed herself from him. And she wasn't tortured by him during that period. I mean, I think the record shows— But the threat, the threat to kill, the threat to kill confirmed by the police, doesn't that under our case law, doesn't that constitute a torture? I think a threat alone—threats can be torture in certain circumstances. When you combine it with all the other stuff that this guy did. I think not because of the contrast. The description of his house, it sounds like the Marquis de Sade's house. Yes, Your Honor. And that's actually the part that the immigration judge, as affirmed by the board, keyed on, was that there was a difference in kind between the torture and the abuse that she received when she was sequestered in that house. And she couldn't seek any help from anybody. And he abused and raped her. And later, when she was able to free herself from him, she no longer lived with him. And she was able to go to the court. And I think it was the family court in Spanish. And he continued to stalk her. And he left a bullet on her doorstep. He did continue to stalk her, but that isn't torture. And our question here is whether or not the likelihood of future torture is compelled by this evidence. And because there was a difference, there was an actual change in his behavior, we cannot say that it is— I wouldn't say that it's compelled that her returning to Jamaica would put her in the same situation she was in before. And I want to contradict my sister counsel's statement about Nuru. Nuru said, yes, past torture gives an inference of future torture if the petitioner or the applicant is returning to the same conditions. She's not returning to the same conditions as when she was previously tortured, right? She's not going to go back into that house with him. He's not going to live with her. And she has a court order now. She has the ability to avail herself of police protection, which she didn't before. And that's what separates this. That's the contrast between the past torture and the likelihood of whether she would be tortured in the future. So from the government's perspective, as long as she's not in the torture house, she's okay. Is that right? I don't want to say okay, Your Honor. I want to say not likely to be tortured. Got it. Obviously, this is a very bad man, and what he has done to her is despicable. But our issue here is actual torture, which is a high bar. And the evidence has to compel the conclusion that it's more likely than not that she would be put in a position again where she would be tortured by this man. And the evidence, again, because of the circumstances changed, just doesn't compel that conclusion, Your Honor. I want to contradict or want to answer at least one other thing. My sister counsel mentioned about the country conditions evidence, and she pointed out that the board and the immigration judge did, in fact, discuss the country conditions evidence. They were aware of it and applied it in this case in their discussion of whether Petitioner was more likely than not to be tortured in the future. This isn't a case where there was a lack of consideration of the evidence. I think it's clear from both the board decision and the immigration decision that they were fully aware of Ms. Dawson's circumstances and made their decision based on the evidence of the record. I don't want to belabor the point, Your Honors. If you have no questions for me, let me ask my colleague. Do either of my colleagues have additional questions for the government? Hearing none, we thank you very much. We'll now hear from Ms. Lim in rebuttal. Thank you, Your Honors, and may it please the Court. In response to the government's argument that the evidence doesn't compel the conclusion that Ms. Dawson faces a likelihood of future torture, the question here really is that the BIA did not apply the correct legal analysis in this case. Under Colby Holder, Neruvi Gonzalez, and Quijada Aguilar, the BIA is required to consider all potentially dispositive evidence in the aggregate, and a finding of past torture creates a presumption of future torture. Yeah, opposing counsels, as it doesn't create a presumption. He said there is an inference if you return to the same situation and the situation has changed. Do you disagree with that? Your Honor, under our reading of Neruvi Gonzalez, the language that a likelihood of future torture is present unless there are significantly changed circumstances, we believe that that does create a presumption of future torture. Okay, they didn't use the word presumption. The word presumption doesn't apply. I don't know that the judiciary can create a presumption for a CAD claim. You're correct. The word presumption is not Neruvi Gonzalez. He said there's an inference, and it's an important factor. But the opposing counsel says the situation has changed because she's been issued a protective order, and he's no longer living in the house with her. So what's your response to that? Yes, Your Honor. I'd also like to mention that the court issued an opinion in a 2006 unpublished case that also mentions a presumption of future torture. However, the issue here is that the BIA did not analyze all evidence of past torture or proceed under the inference of future torture. It assumed arguendo that Ms. Dawson had experienced torture, but incorrectly focused on whether that conduct during a curated two-year post-projective order period was torture. But under Cole, Neru, Quijada Aguilar, and Xochitl Jimenez, the BIA was required to consider all evidence in the aggregate and should not have treated that two-year period as dispositive on the ultimate question. We know that the BIA did not consider all evidence because it failed to mention several key pieces of evidence and mischaracterized the conduct during that two-year period. Second, the protective order does not rebut that inference of future torture, and it's not a significantly changed circumstance. Pursuant to the court's decision in Xochitl Jimenez v. Barr, the protective order should not have been dispositive on that question. The record makes clear that Mr. Hines continued to threaten, intimidate, and torture Ms. Dawson after the protective order was issued, both in her home and in her friend's home when she tried to flee her own home for her safety. This was not a mere diminishment of harm, but a continuation of his torture and abuse. The protective order, Your Honor, wasn't effective. Further, the police refused to enforce the protective order and not only facilitated Hines' abuse, but actively participated in it and threatened her with death as well. Your Honor, I think I forgot to say your time is up, but let me ask my colleague whether either has additional questions for Ms. Lamb. Ms. Lamb, excuse me. All right. Well, again, we thank you. We thank Mr. Stolzer as well, but we especially thank our fine young lawyers-to-be from UCI. We congratulate you. You've done a wonderful job. And however the case comes out, you can know that you're doing well, and we hope you'll come back and argue cases before the Ninth Circuit often. I'm sure the government would agree with that. So we thank you. We congratulate you. The case of Dawson v. Garland is submitted, and the court stands adjourned for the day. This court for this session stands adjourned.
judges: M. Smith, Ikuta, Vratil